**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SORTIUMUSA LLC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Civil Action No. 3:11-cv-1656-M |
| ERIC HUNGER, CHICAGO AMERICAN | § | |
| MANUFACTURING, INC., and BIG TIME | § | |
| PRODUCTS, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions to Dismiss Plaintiff's Second Amended Complaint ("Complaint") [Docket Entry Nos. 31 and 36], filed by Defendants Big Time Products, Inc. ("Big Time" or "BTP"), Chicago American Manufacturing, Inc. ("CAM"), and Eric Hunger.   For the reasons stated herein, the Motions are **GRANTED in part** and **DENIED in part**.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff SortiumUSA LLC ("Sortium") is a Texas company that designs custom displays and fixtures and sells them for use in the sale of retail goods.[1] *Pl.'s Sec. Am. Comp.* at ¶ 2. Defendant Hunger, a Georgia citizen, is a former salesperson for Sortium, who later went to work for CAM, an Illinois company that manufactures and sells displays and fixtures for the sale of retail goods.  *Id.* at ¶¶ 12, 14, 51, 52.   On August 3, 2009, Hunger, an independent contractor, signed an Independent Sales Representative Agreement ("ISRA") with Sortium, limiting his right to work for a competitor of Sortium for one year, and agreeing to nondisclosure and confidentiality

---

1 Because this is a Motion to Dismiss, the Court reviews only the Complaint and the documents referenced in or attached thereto.  *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 790 (N.D. Tex. 2009) (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)).

restrictions.  *Appendix to Pl.'s Sec. Am. Comp.* at 1–6.

Defendant Big Time is a Georgia company that manufactures garden gloves, many of which it sells to retail customers through The Home Depot.  *Id.* at ¶ 13.  As of August 2009, when Sortium hired Hunger, Sortium had a two year relationship with CAM, whereby CAM manufactured and supplied finished retail display elements for Sortium's clients.  *Id.* at ¶ 14.

Shortly after Hunger signed the ISRA, Sortium's president, Rick Sherwood, introduced Hunger to Sherwood's contacts at Big Time and encouraged Hunger to try to obtain business for Sortium from Big Time.  *Id.* at ¶ 25.  Around September 2009, Sortium and Hunger made a sales pitch to Big Time for an outdoor glove display.  *Id.*  ¶¶ 27, 31.  This presentation ultimately resulted in an October 19, 2009, purchase order from Big Time to Sortium for 1,350 glove display units for $272,000 (the "Purchase Order").  *Id.* at ¶¶ 16, 27, and 31.  The Purchase Order provides for cancellation by Big Time thirty days before shipment, but it was not cancelled.  *Id.* at ¶¶ 16, 27, and 31.  Sortium contends that it believed Big Time's demand for glove display units would be annual and recurring, consistent with what it claims in the Complaint as a standard practice within the retail display industry.  *Id.* ¶ 29.  The Purchase Order was satisfied, and there is no other contract between Big Time and Sortium.

Sortium engaged CAM to help develop and manufacture the glove display.  Sortium then engaged in a three-way collaborative effort with Big Time and CAM regarding the design and specifications for the display.  *Id.*  ¶¶ 30.  Between September and October 2009, Sortium gathered details from Big Time, and refined the design for the glove display in response to Big Time's feedback.  *Id.* ¶ 34.  As part of the design process, Sortium generated a set of four undetailed design renderings that demonstrated the overall form and function of the glove displays (the "Design Renderings").  Two of the Design Renderings were marked with a notice that the "[d]esigns, models, engineering drawings, artwork, tooling and all preparatory work created or

furnished by SortiumUSA, LLC are original and remain [Sortium's] exclusive property, unless otherwise agreed upon in writing.   No use of the above material shall be made except by written agreement.   September 1, 2009."   *Id. ¶ 33*; *Appendix to Pl.'s Sec. Am. Comp.* at 16–19.   Two of the other Design Renderings do not bear the date September 1, 2009, but instead, in addition to the rest of what was on the first two Design Renderings, read as follows: "Prepared for Big Time Products by Mason Sherwood, SortiumUSA LLC September 22, 2009 [or September 29, 2009]." These Design Renderings were transmitted to Big Time and CAM for review.   *Id. ¶¶ 35, 36.*

CAM produced "Shop Renderings" which contained twenty-two drawings of glove displays, with technical information relating to manufacturing, including, but not limited to, specification of materials, component dimensions, and a description of manufacturing processes. *Id. ¶ 37*; *Appendix to Pl.'s Sec. Am. Comp.* at 9–12.   While the Shop Renderings were generated by CAM, Sortium's name and company logo was written on each page.   *Id. ¶ 38.*   On November 17, 2009, Sortium paid CAM $182,294.00 for its manufacturing services pursuant to a purchase order invoice.   *Id. ¶ 32.*   The roughly $90,000.00 difference between the two invoices was Sortium's compensation for facilitating and designing the glove display.[2]

Sortium does not allege that Big Time was provided with detailed information about the design of the glove displays nor that it was involved in the design and manufacturing process other than to approve the Design Renderings and to discuss general concepts.   There is no allegation of any written agreement between Sortium and CAM other than the November 17, 2009 purchase order invoice.

In about March 2010, approximately five months after Big Time executed the Purchase Order, Hunger resigned his position with Sortium and went to work for CAM.   *Id. ¶ 51.*   Sortium

---

[2] The invoice from Sortium to Big Time references 1350 units, although Sortium ordered 1400 units from CAM. Plaintiff provided no explanation for the difference in the number of units ordered.

contends that after Hunger departed, CAM ceased contact with Sortium and Big Time and did not place a subsequent order with Sortium. *Id.* ¶ 54. Plaintiff claims that in about April 2011, Big Time was selling garden gloves at The Home Depot, using a "slightly modified" version of the display Sortium supplied to Big Time under the Purchase Order.[3]

The gravamen of Plaintiff's Complaint is that Hunger, on behalf of CAM, sold to Big Time, Sortium's previous client, a garden glove display using Sortium's designs and other proprietary information wrongfully retained by Hunger, and/or wrongfully used by CAM. *Id.* at ¶ 58. Sortium alleges Hunger violated the ISRA by copying Sortium's design and confidential information from Sortium's computers prior to resigning from Sortium and worked for Sortium's competitor, CAM. *Id.* at ¶ 56. Sortium alleges that the glove display design is confidential and proprietary to Sortium, and constitutes its trade secrets. *Id.* at 34–41, 112–120. There is no confidentiality agreement between Sortium and either CAM or Big Time.

On March 23, 2012, the Court granted Big Time's Motion to Dismiss Plaintiff's Original Complaint but granted Plaintiff leave to replead. In doing so, the Court reminded Plaintiff's counsel of his Rule 11 good faith pleading obligations. In the third iteration of its Complaint, Plaintiff asserts twenty-three counts Defendants, pleading virtually every imaginable claim. Against Defendants Hunger and CAM, Sortium claims: Misappropriation of Trade Secrets relating to Customer Lists (Count 8), Tortious Interference with Prospective Relations (Count 11), Tortious Interference with Prospective Relations with Respect to the Sortium–BTP Relationship (Count 12), Tortious Interference with an Existing Contract (Count 13), Equitable Accounting (Count 21), Civil Conspiracy (Count 22), and Direct and Contributory Copyright Infringement (Count 23).

---

[3] During the hearing on these Motions, Plaintiff's counsel stated that the slight modification was only a difference in color.

Sortium alleges the following claims only against Defendant Hunger:   Breach of Non-Compete Provision (Count 1), Breach of Fiduciary Duty (Count 2), and Tortious Interference with Prospective Relations with Respect to the Sortium-CAM Relationship (Count 9).

Sortium alleges the following counts against only Defendant CAM: Vicarious Liability/Respondeat Superior (Count 3), Misappropriation/Unfair Competition for the Glove Display (Count 4), Misappropriation of Trade Secrets Relating to the Glove Display Design (Count 6), Breach of Contract (Count 14), and Conversion (Count 18).

Finally, Sortium alleges these claims against Defendant Big Time: Misappropriation/Unfair Competition (Count 5), Aiding and Abetting Misappropriation of a Trade Secret (Count 7), Quantum Meruit and Unjust Enrichment (Count 15), Aiding and Abetting a Breach of Contract (Count 16), Aiding and Abetting Conversion (Count 19), Equitable Accounting (Count 21), Conspiracy (Count 22), and Copyright Infringement (Count 23). Defendants move to dismiss Plaintiff's Second Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

<u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   In analyzing a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.   *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004).   The pleading standard Rule 8 announces does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   A satisfactory pleading must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

While a court must accept all of the claimant's allegations as true, it is not bound to accept as true "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S.at 678 (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

ANALYSIS

As a threshold matter, the parties dispute whether Texas, Georgia, or Illinois law applies. The parties also dispute whether the ISRA, which contains a Texas choice-of-law provision, is governed by Texas or Georgia law. For the reasons discussed below, the Court applies Georgia law to all of Plaintiff's claims, including breach of the noncompete and nondisclosure provisions in the ISRA (Count 1).

I.   Sortium's Claims Except for the ISRA –Texas's Choice-of-Law Rules:

Because the Court has jurisdiction over this suit based on federal diversity jurisdiction, the Court must apply Texas choice-of-law rules to determine whether Texas, Georgia, or Illinois law governs Sortium's suit. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1413–14 (5th Cir. 1995). Texas follows the most-significant-relationship test set out in the Second Restatement of Conflict of Laws ("the Restatement") to decide choice-of-law issues. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex. 2000). Under this analysis, a single state's law need not govern all substantive issues; thus, each issue is considered separately, and the state law that has the most significant relationship to the issue is applied. *See Bain v. Honeywell Int'l, Inc.,* 257 F.Supp.2d 872, 877 (E.D. Tex. 2002); 17A James Wm. Moore, *Moore's Federal Practice* § 124.31[4][a] (3d ed. 2012). The Restatement test is divided into two steps.

   *a.   Step One:   Is There a True Conflict of Laws?*

   The first step in employing the most significant relationship approach is to decide whether the laws of the various jurisdictions involved conflict.   Only if they do is there a need to resolve a choice-of-law issue.   *Vanderbilt Mortgage & Fin., Inc. v. Posey*, 146 S.W.3d 302, 313 (Tex. App. —Texarkana 2004, no pet.); *see also St. Paul Surplus Lines Ins. Co. v. Geo Pipe Co.,* 25 S.W.3d 900, 903 n. 2 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd by agr.).   In other words, "[t]here are no conflicts if there are no differences between the laws of the respective states concerning the issues relevant to the case."   *See Posey*, 146 S.W.3d at 313; *Hull & Co., Inc. v. Chandler,* 889 S.W.2d 513, 517 (Tex. App. —Houston [14th Dist.] 1994, writ denied) (noting that a party must ordinarily cite the conflicting law of another forum "before undertaking a choice-of-law analysis so that the court can determine whether a true conflict of laws exists").

   After carefully reviewing the law implicated by Sortium's causes of action, the Court finds that there are material differences between the laws of Texas, where Sortium resides, Georgia, where Hunger and Big Time reside, and Illinois, where CAM resides.   For example, with regard to Sortium's claim against Defendants for misappropriation of trade secrets, the Georgia Trade Secrets Act ("GTSA") expressly preempts common law tort claims for misappropriation of a trade secret.   Illinois has a similar preemption law, but Texas does not.   This difference is illustrative of many of the distinctions to be found between the laws of Georgia, Illinois, and Texas on the issues relevant to this lawsuit.   Due to the material differences that are present, the Court embarks upon a full choice-of-law analysis to determine which state's law should govern the claims in this action.

   *b.   Step Two:   The Relationship Factors*

   If the laws between the interested states differ, as they do in this case, the second step in deciding what law applies is to determine which state, with respect to each issue, has the "most

significant relationship to the occurrence and the parties." *See* Restatement (Second) on Conflict of laws § 145 (1971).   In tort cases, this phase of the choice-of-law analysis involves two levels: the general test and the specific test.

Section 6 of the Restatement of Conflicts sets forth the general principles which guide the application of the more specific rules, and states in full:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971); *see also CPS Int'l Inc. v. Dresser Indus., Inc.*, 911 S.W.2d 18, 29 n. 11 (Tex. App. —El Paso 1995, writ denied).   In applying § 6 to this case, the Court first identifies the relevant state contacts to be considered.   After the contacts are identified through a factual inquiry, the choice-of-law question is to be determined by the Court as a matter of law.   Selection of the applicable law depends not on the number of contacts with an interested jurisdiction, but rather on the qualitative nature of the particular contacts.

While § 6 "sets out the general principles by which the more specific rules are to be applied," § 145 adds additional factors to be utilized in tort cases:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.  Restatement (Second) of Conflict of Laws § 145 (1971).  The following state contacts are present in this case:  Sortium is a Texas company with clients in Georgia, Big Time has offices in Georgia and sells gloves in The Home Depot stores, and Hunger lives in Georgia and his sales territory for Sortium included Georgia.  Plaintiff does not allege that Hunger worked for Sortium in Texas.

As to the first § 6 factor, the needs of the interstate and international systems, neither party has presented any argument over which law is favored by this factor, and thus the Court finds that this factor is neutral.  The second, third, and fifth factors mandate a comparison of each interested state's policies and interests underlying the issues to be decided.  Focusing on trade secret and employee misappropriation issues, the laws of Texas, Georgia, and Illinois have similar goals. Indeed, these states all have bodies of law which proscribe unlawful business conduct by employees vis à vis their employers, but also encourage competition and the free mobility of labor. These states also have established laws protecting employers from misappropriation of trade secrets.  This factor is slightly tilted in favor of Georgia to the extent that the complained of conduct was aimed at CAM's obtaining a competitive advantage with Big Time, a Georgia business, although Texas has a substantial interest in protecting its businesses from misappropriation.

The fourth and sixth factors apply most logically in areas like contract law, where the parties' conduct and planning is based on maximizing certainty and predictability.  These factors

are entitled to little weight in a case where the causes of action asserted are, as here, mostly torts.[4]

Restatement (Second) of Conflict of Laws § 145(1) cmt. b (1971) ("[T]he protection of the

justified expectations of the parties, which is of extreme importance in such fields as contracts,

property, wills and trusts, is of lesser importance in the field of torts.... Likewise, the values of

certainty, predictability, and uniformity of result are of lesser importance in torts than in areas

where the parties and their lawyers are likely to give thought to the problem of the applicable law

in planning their transactions.").   Thus, these particular factors do not materially aid this Court's

choice-of-law analysis with regard to most of Sortium's claims, and do not weigh for or against the

application of either state's substantive laws.   Last, the seventh factor asks the Court to consider

ease in the determination and application of the law to be applied.   Because Texas, Georgia, and

Illinois laws regarding tort claims are relatively easy to discern and apply, the competing interests

for this factor render the seventh factor neutral.

The Court next analyzes the specific factors enumerated in § 145 for tort claims.   Factors

one and two, the place where the injury occurred and the place where the conduct causing the

injury occurred, favor application of Georgia law.   This case is centered on the allegation that

CAM and Hunger sold Big Time a product based on Sortium's design.   Because Big Time is in

Georgia and Hunger sells for CAM and sold for Sortium in Georgia, most of the alleged tortious

activity, *i.e.*, the alleged misappropriation of Sortium's design, and communications with Big

Time to consummate its order from CAM, would have occurred in Georgia.   Next, application of

the third factor is neutral, as Plaintiff is a Texas company, Big Time is a Georgia company, and

CAM is an Illinois company.   Factor four, the place where the relationship between the parties is

---

4  Of the 23 claims alleged by Plaintiff, only two involve an alleged breach of contract.   The Court analyzes the choice-of-law issue for Plaintiff's claim against Hunger for breach of the ISRA in section II separately because the ISRA contains a choice-of-law provision, which requires a different analysis.   As to Plaintiff's breach of contract claim against CAM, factors 4 and 6 weigh against application of Georgia law.   Each party would expect the law of their state to govern the contract.

centered, again favors application of Georgia law.   At the center of this dispute is the relationship arising out of the Purchase Order, signed by a Georgia client through the efforts of a Georgia-based salesperson, and the subsequent misappropriation of trade secrets, which would have occurred, if at all, in Georgia and Illinois by Hunger and CAM.   The place of performance of the ISRA, *i.e.*, Hunger's sales territory, was Georgia and adjacent states.   *Appendix to Pl.'s Sec. Am. Compl.* at 1.

With regard to the four specific tort factors, three weigh in favor of Georgia law, and one is neutral.   Thus, after considering the general and specific choice-of-law tests in tandem, the Court holds that the quality of Defendants' contacts alleged in Sortium's claims has the "most significant relationship" with Georgia.   Accordingly, the Court finds that Georgia law applies to Sortium's claims.[5]   *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex. 1990).

II.     Law Governing the Enforceability of the ISRA

Because of the choice-of-law provision contained in the ISRA, the Court considers this choice-of-law issue separately.   Plaintiff contends that Texas law applies because the ISRA provides for the application of Texas law, and Texas law honors choice-of-law clauses in employment agreements.   Hunger argues that Georgia law applies, despite the parties' agreement to the contrary, because Georgia has a materially greater interest than Texas in whether this agreement is enforced and because of Georgia's strong public policy interest against noncompetition covenants.

Sortium and Hunger chose Texas law to govern the enforceability and interpretation of Hunger's Independent Sales Representative Agreement.   Section 187 of the Restatement (Second) of Conflict of Laws states:

---

[5] In light of this finding, Plaintiff's Texas Theft Liability claim (Count 17) is hereby dismissed. The Court finds that Plaintiff's tort claims are governed by Georgia law.   As such, Plaintiff cannot maintain the subject claim.

(1)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2)   The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement § 187.     Because the issue of whether the agreement is enforceable is not one which the parties would have resolved by an explicit provision, § 187(2) applies.     Under § 187(2), Texas law should govern the ISRA unless it falls within the exception stated in 187(2)(b).   Whether that exception applies depends upon three determinations:   first, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether this noncompetition agreement should be enforced; and third, whether the state's fundamental policy would be contravened by the application of the law of the chosen state. *DeSantis*, 793 S.W.2d at 677–78.   To reject the parties' choice-of-law, each element of the Restatement's test must be met.  *Mary Kay Inc. v. Woolf,* 146 S.W.3d 813, 816–17 (Tex. App —Dallas 2004, pet. denied).

In arguing for the application of Georgia law, Hunger relies heavily on *DeSantis*, where the Texas Supreme Court concluded that Texas law governed the enforceability of the noncompete agreement, even thought the agreement chose Florida law.   793 S.W.2d 670, 677–78.  *DeSantis*

is instructive in light of its factual similarity to the instant case.   There, Wackenhut, a business

chartered and headquartered in Florida, hired DeSantis as an area manager for the Houston area.

At Wackenhut's request, DeSantis signed—in Texas—a noncompetition agreement with a Florida

choice-of-law provision. Following DeSantis's resignation after approximately three years of

employment, DeSantis started a competing business in Texas, purportedly in violation of his

noncompetition agreement.   In deciding what effect to give to the parties' contractual

choice-of-law provision, the court, following the approach prescribed in § 187(2), determined that

Texas law applied.

As to the first factor regarding which state has a more significant relationship to the parties

and underlying litigation, the court found significant that DeSantis was hired to manage business

in the Houston area, the noncompetition agreement was executed by DeSantis in Houston, and the

place of performance for the contract was largely in Texas.   Finding that the "gist of the

agreement … was the performance of personal services in Texas," the court concluded that

Texas's relationship "was clearly more significant" than that of Florida.   *Id.*   Next, the Court

considered whether Texas had a materially greater interest than Florida in determining whether the

noncompetition agreement was enforceable.   In finding in the affirmative, the court noted that

Texas is directly interested in the employees in the state, in Wackenhut as a national employer

doing business in Texas, and in consumers of the services furnished in Texas by Wackenhut, in the

new business formed by Desantis in Texas, and in consumers of the services furnished in Texas by

Wackenhut and DeSantis.   *Id.*   As to the final issue concerning whether the application of Florida

law would be contrary to Texas's fundamental policy, the court noted that "what noncompetition

agreements are reasonable restraints upon employees" is a matter of fundamental policy in Texas

as it ensures "a uniform rule for enforcement of noncompetition agreements in this state."   *Id.*

(citing Restatement § 187 comment g (1971) ("a fundamental policy may be embodied in a statute

which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power").

In this case, as in *DeSantis*, the Court finds that Georgia law should govern the enforceability of the ISRA.   The Court has already found that Georgia has a more significant relationship with Sortium-Hunger's relationship and the ISRA and need not engage in that analysis for the second time.   The Court next analyzes whether Georgia has a materially greater interest than Texas in deciding whether the noncompetition agreement should be enforced.   This analysis "includes some of the factors of the contacts analysis of § 6, but also involves the policy behind the law at issue.   *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 751 (S.D. Tex. 2009) (citing *Desantis*, 793 S.W.2d at 679).

The Court recognizes that Texas has a strong interest in enforcing its resident's contracts.   As the Texas Supreme Court recognized in *DeSantis*, "this principle derives from the most basic policy of contract law, which is the protection of the justified expectations of the parties.   The parties' understanding of their respective contractual rights and obligations depend in part upon the certainty with which they may predict how the law will interpret and enforce their agreement." *DeSantis*, 793 S.W.2d at 679.   However, here, what is at stake is whether a Georgia resident can leave one job in Georgia and work for a competing business in Georgia.   Georgia has a direct interest in restrictions on Hunger's ability to provide personal services in Georgia.   "The gist of the agreement in this case [i]s the performance of personal services in [Georgia]."   *DeSantis*, 793 S.W.2d at 679.   While Texas has an interest in protecting the justifiable expectations of Sortium and protecting Sortium from post-employment competition, Georgia has a materially greater interest than Texas in deciding whether the ISRA should be enforced.

Finally, having concluded that Georgia law would control the issue of enforceability of the noncompetition agreement in this case but for the parties' choice of Texas law, and that Georgia's

interest in deciding this issue is materially greater than is Texas's, the Court determines whether application of Texas law to decide this issue would be contrary to Georgia's fundamental policy. As the Texas Supreme Court stated in *DeSantis,* "[w]hat noncompetition agreements are reasonable restraints upon employees in this state . . . is a matter of public policy" because "it ensures a uniform rule for enforcement of noncompetition agreements." *Id.*   The court noted that "these same considerations and others have led virtually every court that has addressed the question of whether enforcement of noncompetition agreements is a matter of fundamental or important state policy to answer affirmatively." *Id.* (citing *Nasco, Inc. v. Gimbert*, 239 Ga. 675, 238 S.E.2d 368, 369 (1977)).   Georgia courts confirm that the enforcement of noncompetition agreements is a matter of fundamental Georgia policy.   *Boone v. Corestaff Support Services, Inc.*, 805 F. Supp. 2d 1362, 1369 (N.D. Ga. 2011) (applying Georgia law) ("[i]f a restrictive covenant is not enforceable under Georgia law, it is violative of Georgia's public policy and a choice-of-law provision choosing the law of a foreign jurisdiction may not be applied to enforce the covenant."); *Nasco, Inc. v. Gimbert*, 239 Ga. 675, 676, 238 S.E.2d 368, 369 (1977).

Here, as in *DeSantis*, the law governing enforcement of noncompetition agreements is fundamental policy in Georgia and that to apply the law of Texas to determine the enforceability of the ISRA would be contrary to that policy.   Having concluded that Georgia law controls the issue of enforceability of the ISRA, and that Georgia law applies to each of Sortium's other claims, the Court analyzes each of Sortium's counts under Georgia law.

I.   Count 1: Breach of the Non-Compete and Non-Disclosure Provisions Against Defendant Hunger

Sortium alleges that Hunger breached the noncompete provision in the ISRA when he joined CAM as a salesperson within one year of leaving Sortium and "intentionally concealed from Plaintiff his decision and plans to begin working for Defendant CAM in the future to lure

accounts, customers, and clientele from Plaintiff Sortium." *Pl.'s Sec. Am. Comp.* at ¶¶ 79–81.

Under Georgia law, "[r]estrictive covenants in employment contracts are in partial restraint of trade and are enforceable only if strictly limited in time and territorial effect and are otherwise reasonable considering the business interest of the employer sought to be protected and the effect on the employee." *Bunker Hill Int'l, Ltd. v. Nationsbuilder Ins. Servs., Inc.*, 710 S.E.2d 662, 666 (Ga. Ct. App. 2011) (internal citation omitted).   Further, Georgia rejects the "blue-pencil theory of severability" meaning that "if any of the sub-paragraphs of the restrictive covenant are invalid, the entire covenant must fall." *Uni–Worth Enters. v. Wilson,* 261 S.E.2d 572, 640 (Ga. 1979).

The non-compete clause in the ISRA seeks to prohibit Hunger from engaging, directly or indirectly, in the selling of *any products of any manufacturer which is in competition with Sortium* for a period of 1 year.   *Appendix to Pl.'s Second Amended Complaint.* at 3 ¶ 11.   The agreement lacks a geographical limitation of any kind and bars Hunger from working in any capacity for any Sortium competitor.   Under Georgia law, this agreement is *per se* unreasonable, and therefore, unenforceable.   *See Dent Wizard Int'l Corp. v. Brown*, 612 S.E.2d 873, 876 (Ga. Ct. App. 2005) (covenant not to compete containing 4-county territorial restriction invalid under Georgia law where former employee had worked in only 2 or 3 of 4 specified counties); *American Gen. Life & Accident Ins. Co. v. Fisher*, 430 S.E.2d 166, 168 (Ga. Ct. App. 1993) (agreement unenforceable where employee in effect prohibited from working in any capacity for a competitor).

Count 1 also asserts a claim against Hunger for breach of the agreement's non-disclosure provision.   *Pl.'s Sec. Am. Comp.* at ¶ 82.   Paragraph 10 of ISRA prohibits Hunger, during the term of the agreement or at any time afterwards, from making use of or disclosing, for any purpose whatsoever, any of Sortium's confidential and proprietary information.   *Appendix to Pl.'s Second Amended Complaint.* at 3 ¶ 10.   The law in Georgia is that covenants not to disclose confidential information can be enforced even if other restrictive covenants contained in the contract are

unenforceable.  *Durham v. Stand-By Labor,* 230 Ga. 558, 198 S.E.2d 145 (1973); *Ward v.*

*Process Control Corp.,* 247 Ga. 583, 277 S.E.2d 671 (1981); *Mktg. & Research Counselors, Inc. v.*

*Booth*, 601 F. Supp. 615, 617 (N.D. Ga. 1985).   However, under Georgia law, a nondisclosure

clause with no time limit is unenforceable as to information that is not a trade secret.   *Allen v. Hub*

*Cap Heaven, Inc.*, 484 S.E.2d 259, 265-66 (Ga. Ct. App. 1997) (internal citations omitted); *U3S*

*Corp. of Am. v. Parker*, 414 S.E.2d 513, 516 (Ga. Ct. App. 1991).

Here, because the ISRA contains no temporal limitation on the nondisclosure

requirements,   Plaintiff's claim relating to wrongful disclosure of non-trade secret information is

dismissed (Count 1).   Plaintiff's claim for breach of the non-disclosure requirements as they

relate to customer list remains, because the customer list is alleged to be Plaintiff's trade secret,

and the Court finds that it cannot resolve that issue without a development of the facts.   Thus, the

Motion to Dismiss Count 1 is granted in part and denied in part.

II.   Count 2:   Breach of Fiduciary Duty Against Hunger

Count 2 seeks to hold Hunger liable for a purported breach of fiduciary duty for

misappropriation of trade secrets and interference with contractual relations.   *Pl.'s Sec. Am.*

*Comp.* at ¶ 84–91.   Plaintiff alleges Hunger owed "Plaintiff the fiduciary obligations of care,

loyalty, and candor" as well as the duty not to "divulge Plaintiff's trade secrets."   *Id.*   It is well

settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence

of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.

*Jonas v. Jonas*, 280 Ga. App. 155, 160, 633 S.E.2d 544, 550 (2006).   Hunger does not dispute that

he had a fiduciary relationship with Sortium.   Plaintiff also alleges sufficient facts regarding

Hunger's alleged breach of his duty—namely, that Hunger shared Plaintiff's purported trade

secrets with CAM and interfered with Sortium's business relationships.

The Georgia Trade Secrets Act ("GTSA") preempts any "conflicting tort, restitutionary, and other laws of [Georgia] providing civil remedies for misappropriation of a trade secret." Ga. Code Ann. § 10-1-767 (West 2012). Under the GTSA, Plaintiff cannot bring a breach of fiduciary duty claim against Hunger only on account of Hunger's alleged misappropriation of trade secrets. Thus, to the extent Count 2 is based on allegations relating to Hunger's alleged misappropriation of trade secrets, it is preempted by the GTSA and is dismissed. The claim against Hunger of breach of fiduciary duty in interfering with Sortium's relationship with Big Time survives.

III.   Count 3:  Vicarious Liability and Respondeat Superior Claim Against CAM

In Count 3, Sortium seeks to hold CAM vicariously liable for Hunger's alleged breach of his non-compete agreement and his allegedly tortious actions committed while he worked for CAM. *Pl.'s Second Amended Complaint*, ¶ 93–95. Specifically, Sortium argues CAM should be liable for Hunger's acts that included: (1) retention and use of proprietary Sortium data and information, and (2) solicitation of Sortium clients for the purposes of marketing products on behalf of Defendant CAM with the intention . . . of delivering these products while using the data and information developed solely by Plaintiff Sortium. *Id.* at 94.

Under Georgia law, under the doctrine of *respondeat superior*, a master is liable for the tort of its servant only to the extent that the servant committed the tort in connection with his employment by the master, within the scope of his employment, and in furtherance of his master's business. *See Piedmont Hosp. v. Palladino*, 580 S.E.2d 215 (Ga. 2003). "[T]he general rule for determining whether the master is liable for the acts of an employee is 'not whether the act was done during the existence of the employment, but whether it was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment.'" *B-T Two, Inc. v. Bennett*, 706 S.E.2d 87, 90 (Ga. Ct. App. 2011) (internal quotations omitted).

"Although a jury often must resolve whether a servant, at the time he committed a tort, was acting within the scope of his employment and in furtherance of his master's business, the evidence in some cases is so plain and undisputable that the court properly may decide a *respondeat superior* claim as a matter of law." *Id.*   It is axiomatic that a party can only be liable for the acts of its agents which took place during and within the scope of the agency, and in his capacity as agent. *See id.*

To the extent Plaintiff's claim is based on Hunger's alleged breach of the ISRA, it fails as a matter of law because *respondeat superior,* which is based on the doctrine of actual authority, applies only to tort based liability.   *B-T Two, Inc.*, 706 S.E.2d at 90.   To the extent Plaintiff's claim is based on Hunger's action which took place before Hunger joined CAM, that claim also fails.   *See id.*

As discussed in further detail below, to the extent Plaintiff alleges that CAM is responsible for the alleged misappropriation of a trade secret (customer list) that occurred while Hunger was working for CAM, dismissal of that claim on an undeveloped record is premature.   Otherwise, Count 3 is dismissed.

IV.   Count 4:  Misappropriation/Unfair Competition Against Defendant CAM

Count 4 seeks to hold CAM liable for allegedly misappropriating the glove display designs that Sortium claims is a trade secret, and "us[ing[ the results of Sortium's effort in fulfilling Defendant [Big Time's] order for the second production run of [glove display units] . . . thereby gaining a free-ride at Sortium's expense."   *Pl.'s Sec. Am. Comp.* at ¶ 96–103.

To the extent this claim is based on CAM's misappropriation of Sortium's trade secrets, it is preempted by GTSA.  Ga. Code Ann. § 10-1-767 (West 2012).   The GTSA's preemption scope encompasses not just common law misappropriation claims, but also other common law theories where liability is based on the alleged misappropriation of information that is claimed to

be proprietary.  *Robbins v. Supermarket Equip. Sales, LLC*, 722 S.E.2d 55, 58 (Ga. 2012).   The Supreme Court of Georgia recently stated that "[f]or the GTSA to maintain its exclusiveness, a plaintiff cannot be allowed to plead a lesser and alternate theory of restitution simply because the information does not qualify as a trade secret under the act." *Id.*   Thus, even claims that are pled in the alternative to a trade secret misappropriation claim are pre-empted by the GTSA.   *Id.*

To the extent Plaintiff's claim is based on CAM getting an unfair advantage by using Sortium's prior design for the glove display units, that claim must also be dismissed.   "[I]n Georgia the term unfair competition is a nomenclature for the doctrine that one cannot pass off his goods as those of another[,]" and the cases employing the term generally only do so in the context of common law trademark infringement.   *Nationwide Adver. Svc., Inc. v. Thompson Recruitment Adver., Inc.*, 359 S.E.2d 737, 741 (Ga. Ct. App. 1987).   Here, Sortium makes no allegation that CAM tried to pass off anything as being made by Sortium, nor does it assert any common law trademark infringement claim.   To the extent Sortium alleges unfair competition based upon the alleged misappropriation of unspecified other items (Pl.'s Sec. Amended Compl.¶ 99), its claims fail under *Iqbal*, which requires Plaintiff to plead a plausible claim.   *Iqbal*, 129 S. Ct. at 1949. Despite having been granted three opportunities, it did not do so.   Count 4 is dismissed.

V.   Count 5: Misappropriation/ Unfair Competition against Defendant Big Time for Use of the Glove Display Design

Sortium alleges that Big Time "used the results of Plaintiff Sortium's efforts … in fulfilling The Home Depot's demand for Glove Displays without ordering them from Sortium, thereby gaining a free ride at Sortium's expense." *Pl.'s Sec. Am. Compl.* at ¶ 104–109.   Plaintiff further contends that by engaging in unfair competition, Big Time has "acquired enhanced positioning and resources to compete in custom retail display markets."   *Id.* at ¶ 107.

Again, Georgia's unfair competition claim is nomenclature for a doctrine that one cannot pass off his goods as those of another. *Nationwide Adver.*, 359 S.E.2d at 741. Big Time sells gloves and does not do any business in the market for custom retail displays. Moreover, even if Big Time were engaged in the business of selling glove display units, Plaintiff does not allege that Big Time tried to pass off the glove display units as its own design or as Sortium's. What Plaintiff really takes issue with is Big Time's decision to order glove display units directly from CAM, thereby cutting Plaintiff out of the transaction. These allegations do not state a claim for unfair competition under Georgia law. Count 5 is thus dismissed.

VI.   Counts 6 and 7:   Misappropriation of Trade Secrets (Glove Display and Other Designs) against CAM

In Count 6, Sortium alleges that the glove display renderings constitute a trade secret of Sortium's, and that CAM used Sortium's trade secret to fulfill an order for Big Time. *Pl.'s Sec. Am. Compl.* 110-125. To recover under the GTSA, Plaintiff must demonstrate that its glove design, embodied by the Design and Shop Renderings, is a trade secret as defined by the Georgia Code, and that CAM misappropriated this trade secret.

Georgia law defines "trade secret" as "information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ga. Code Ann. § 10-1-761 (West

2012).   If an employer does not prove both prongs of this test, it is not entitled to protection under the Act.   *Bacon v. Volvo Serv. Ctr., Inc.*, 266 Ga. App. 543, 544, 597 S.E.2d 440, 443 (2004).

First, CAM argues that the Design and Shop Renderings were not a secret, as the design is readily available in the public realm, *i.e.*, in The Home Depot, and can be reverse engineered. *Defs.' Mot. to Dismiss* at 15–16.   Plaintiff argues that the Design and Shop Renderings together constitute a trade secret. The Court agrees that the glove display units are intended for public display, and that any individual can examine a unit in public to attempt to reverse engineer the design, but the Court cannot decide as a matter of law based merely on the pleadings that the renderings do not provide unique detail that would not be readily known to an inspector of the glove display units.

But even if the information reflected in the Design and Shop Renderings was not readily ascertainable to an inspector, Plaintiff has not pled sufficient facts demonstrating that it took adequate precautions to prevent the dissemination of the alleged secret.   The Design Renderings depict a product publicly displayed at The Home Depot stores.   While the Design Renderings bear an ownership notice, this notice does not state that the drawings constitute Sortium's trade secret, or proprietary or confidential information.

As for the Shop Renderings, these drawings do not bear any restrictive warning as to their alleged confidentiality or instructions to the persons working on them to safeguard their alleged secrecy.   Sortium refers to a "confidentiality statement" at the bottom of its e-mail exchanges with Defendants stating that "[t]he information contained in this e-mail and any attached documents *may* contain information that is confidential or otherwise protected from disclosure." That is merely a generic warning to inadvertent recipients commonly found on e-mails.   *Appendix to Pl.'s Sec. Am. Comp.* at 8.   The language only suggests that there is a possibility that information contained in a given email is confidential and the language appears only to prohibit use and

distribution by "unintended recipients," *i.e.*, parties other than CAM or Big Time.  It bears no relevance, as a matter of law, as to whether Sortium took appropriate steps to safeguard its alleged trade secrets.  In addition, the pleadings do not state that either CAM or Big Time signed any confidentiality or non-disclosure agreements agreeing to protect the confidentiality of the design for the glove display units.

As a matter of law, Sortium's pleading of what precautions it took to prevent dissemination of the Design and Shop Renderings is fatally deficient.  *Bacon v. Volvo Serv. Ctr., Inc.*, 266 Ga. App. 543, 597 S.E.2d 440 (2004) (finding that since employer took no precautions to maintain the confidentiality of its customer list, employer's customer list was not a "trade secret" under the Act).  Sortium's failure to identify any of the drawings as confidential, its failure to require CAM or Big Time to execute a confidentiality agreement, and its failure to plead any other steps to protect the secrecy of the Design and Shop Renderings preclude it from recovering on a cause of action for misappropriation of the design reflected in them.

As to the unspecified "designs similar to" the Glove Display, other than the Design and Shop Renderings, Sortium fails to plead any facts regarding other designs allegedly misappropriated.  The pleadings do not identify these other designs with particularity or state how these designs were misappropriated by Defendants.  These allegations fail to meet the Supreme Court's mandate that the plaintiff allege facts sufficient to establish a claim that is plausible. *Twombly*, 550 U.S. at 570.  Counts 6 and 7 (Aiding and Abetting Misappropriation of the Glove Display against Big Time) are dismissed.

## VII.  Count 8:  Misappropriation of Trade Secrets (Customer List) Against Defendants CAM and Hunger

In Count 8, Sortium alleges that Hunger and CAM misappropriated Sortium's customer list, which Sortium alleges is a trade secret, and that Hunger and CAM used the list to contact

Sortium's customers.  *Pl.'s Sec. Am. Compl.* 133–148.  Specifically, Plaintiff contends that "Defendant Hunger has contacted names on Plaintiff Sortium's customer list to solicit business on behalf of CAM," *Pl.'s Sec. Am. Compl.* at 141, identifying one customer other than Big Time.

While a client list may be subject to confidential treatment under the GTSA, the information itself is not inherently confidential. "[C]ustomers are not trade secrets." *Wolff v. Protégé Sys.,* 234 Ga. App. 251, 253(1)(c), 506 S.E.2d 429 (1998) (internal quotations omitted). Confidentiality is afforded only where the customer list is not generally known or ascertainable from other sources and was the subject of reasonable efforts to maintain its secrecy.  *See* Ga. Code Ann. § 10–1–761(4).

Plaintiff has alleged sufficient facts regarding its efforts to protect the secrecy of its customer list and that the information is not generally known or ascertainable from other sources. Plaintiff alleges that Hunger signed a confidentiality agreement, and that it maintained its customer list on a single, password-protected computer, that it has implemented a policy prohibiting employees from printing or copying the customer list on removable media such as USB drives, and that its list is generally unknown to competitors.  Plaintiff's alleged actions of misappropriation of its customer list against Hunger and CAM are sufficient to survive dismissal. Count 8 survives.

VIII.   Count 9:   Tortious Interference Claim with Prospective Relations Against Hunger with Respect to the Sortium-CAM Relationship

In Count 9, Sortium alleges that Hunger tortiously interfered with Sortium's business relationship with CAM by inducing CAM to hire Hunger for the purpose of luring Sortium's client to CAM.  To recover under a theory of tortious interference with business relations, a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and maliciously with the intent to injure, (3) induced a third party or parties not to enter into or

continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury. *Renden, Inc. v. Liberty Real Estate*, 213 Ga. App. 333, 334(2), 444 S.E. 2d 814 (1994).   The term "maliciously" is broadly construed to encompass any unauthorized interference or any interference without legal justification or excuse.   *Id*.   In order to maintain an action for interference with prospective relations, Plaintiff must establish that "absent the interference, those relations were reasonably likely to develop in fact."   *Galardi v. Steele-Inman*, 266 Ga. App. 515, 522, 597 S.E.2d 571, 577 (2004).

Plaintiff alleges that its relationship with CAM predated the Purchase Order between Sortium and Big Time by almost two years.   *Pl.'s Sec. Am. Compl.* ¶ 14.   The Court cannot determine on the current record, as a matter of law, that Plaintiff did not have a reasonable expectancy of future business with CAM.   *Galardi*, 266 Ga. App. 515.   Plaintiff also alleges sufficient facts regarding whether Hunger acted purposefully and maliciously with the intent to injure Sortium—namely that Hunger misappropriated Sortium's confidential information to lure clients away from Sortium.   The Court thus does not dismiss Count 9.

IX.   **Count 10:   Tortious Interference with Existing Contract with Respect to the ISRA against CAM**

In Count 10, Sortium alleges that CAM tortiously interfered with Hunger's ISRA "by inducing Defendant Hunger to end his agreement with Plaintiff Sortium and work with Defendant CAM for the purpose of luring away Sortium clients to Defendant CAM."   *Pl.'s Sec. Am. Compl.* ¶ 155–160.

Under Georgia law, the elements of tortious interference with a contract consist of: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual obligation or caused a party or third party to discontinue or fail to enter into an

anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. *Disaster Svcs. v. ERC Partnership,* 228 Ga. App. Ct. 739, 740 (1997). An employment at will contract has been held to provide no basis for tortious interference with a contract. *Culpepper v. Thompson*, 254 Ga. App. Ct. 569 (2002).

The ISRA grants Sortium or Hunger the right to terminate Hunger's engagement as an independent contractor with thirty days' written notice. *Appendix to Pl.'s Sec. Am. Compl.* at 1–6. Thus, Hunger's engagement with Sortium was terminable at any time with advance notice to the other party. "A cause of action for intentional interference with contractual rights must be based on the intentional and non-privileged interference by a third party *with existing contractual rights and relations*." *Moore BellSouth Mobility, Inc.*, 243 Ga. App. 674, 676, (2000) (emphasis added). Because the ISRA is an employment-at-will contract, the alleged tortious conduct of CAM in inducing Hunger to leave Sortium and join CAM does not give rise to an action for interfering with an employment contract. *Culpepper*, 254 Ga. App. Ct. at 571 (2002); *Moore v. BellSouth Mobility,* 243 Ga. App. Ct. 674, 676 (2000). The Court dismisses Count 10.

X.    Counts 11 and 13:  Tortious Interference with Prospective Relations and Existing Contracts against Defendants Hunger and CAM

In Counts 11 and 13, Sortium seeks to hold CAM and Hunger liable for allegedly interfering with Sortium's relationships with clients other than Big Time in the retail display industry. *Pl.'s Sec. Am. Compl.* ¶ 161–169. Sortium contends that from the commencement of Hunger's employment with CAM, Hunger and CAM have convinced Sortium's customers to order display elements from CAM rather than through Sortium. *Id.* Tortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent

to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.   *Chaney v. Harrison & Lynam, LLC*, 308 Ga. App. 808, 818 (2011)

Sortium has not alleged facts sufficient to state a plausible claim of actionable tortious interference.   As a matter of law, CAM is free to compete for business from Sortium's clients. *Sommers Co. v. Moore*, 275 Ga. App. 604, 621 S.E.2d 789, 790 (2005) (stating that in the context of a tortious interference with contractual relations claim, fair competition is always legal). Sortium has not identified any customers other than Big Time with which Defendants are alleged to have interfered, nor any business lost as a result of the alleged interference.   Sortium also has not alleged facts establishing any relationship that would give rise to an expectancy of continuing business from a client.   *See Chaney*, 308 Ga. App. 808.    Based on these deficiencies, Counts 11 and 13 are dismissed.

XI.    Count 12: Tortious Interference with Prospective Relations with Respect to the Sortium-BTP Relationship against Defendants CAM and Hunger

Count 12 purports to state a claim against CAM and Hunger for interfering with Sortium's alleged business relationship with Big Time.   *Pl.'s Sec. Am. Compl.* ¶ 170–177.   Instead, Plaintiff alleges that "[t]here is a reasonable probability that since [T]he Home Depot demanded the Glove Displays from Defendant [Big Time], that [Big Time] would have ordered the Glove Displays from Plaintiff Sortium if Defendant CAM had not agreed to supply them directly to [Big Time].   *Pl.'s Sec. Am. Compl.* ¶ 176.   The issue is not whether Big Time would continue to need glove display units, but rather whether Plaintiff had a *reasonable* expectation that Big Time would order glove display units from it, as opposed to its competitors.   Plaintiff's allegations are

insufficient to establish a reasonable expectancy of a future business relationship with Big Time, as required.   *See Chaney*, 308 Ga. App. 808.   Therefore, Count 12 is dismissed.

XII.   Counts 14 and 16:   Breach of Contract against Defendant CAM

In Count 14, Sortium alleges that CAM breached its contract with Sortium by failing to maintain the confidentiality of Sortium's proprietary information and manufacturing glove displays for another client, Big Time.   *Pl.'s Sec. Am. Compl.* ¶ 185–193.   Plaintiff also alleges that CAM materially breached an agreement between CAM and Plaintiff by hiring Hunger and using Plaintiff's designs.

Plaintiff does not claim that CAM failed to perform under the November 17, 2009, Purchase Order, where Sortium paid CAM $182,294.00 to manufacture 1400 glove display units for its client, Big Time.   That Purchase Order does not prohibit CAM from hiring Hunger nor from selling glove display units to customers based on a previously manufactured design. Plaintiff does not allege any other contractual agreement with CAM.   Thus, Count 14 fails because Sortium has not alleged facts establishing the existence of a contract it claims CAM breached.   For these same reasons, the Court dismisses Count 16 ("Aiding and Abetting Breach of Contract Against Big Time").   Because Plaintiff has not alleged a valid breach of contract claim against CAM, Plaintiff also cannot allege a valid aiding and abetting breach of contract claim against Big Time.

XIII.   Count 15: Quantum Meruit Claim or Unjust Enrichment against Big Time

Plaintiff contends that Big Time enjoyed a 33% savings between the Purchase Order and the price it paid for its subsequent order of glove display units from CAM.   *Pl.'s Sec. Am. Compl.* ¶ 194–202.   The essential elements of a quantum meruit claim are: (1) the performance of valuable services; (2) accepted by the recipient or at his request; (3) the failure to compensate the provider would be unjust; and (4) the provider expected compensation at the time services were

rendered. *Amend v. 485 Properties*, 627 S.E.2d 565, 567 (Ga. App. Ct. 2006). If Plaintiff's claim arises from the Purchase Order between it and Big Time, the claim, which sounds in equity, cannot be pursued, because these parties' only relationship arises from an express contract. *Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. App. Ct. 2005)

      The Court finds Plaintiff's theory of quantum meruit defective. Sortium profited by roughly $90,000.00 as a result of Big Time signing the Purchase Order. Big Time had no obligations to purchase additional glove display units from Plaintiff. Sortium's claim for *additional* amounts allegedly owed by Big Time for the very products Sortium admits Big Time has already paid for under the Purchase Order fails. *See Amend*, 627 S.E. 2d at 567. Because Sortium supplied nothing else to Big Time, there is no quantum meruit action available to Plaintiff. Count 15 is dismissed.

### XIV.    Counts 18, 19 and 20:  Conversion (in the alternative to Count 6) for Materials Related to Glove Display Renderings

      Count 18 is pled alternatively to Count 6, and Count 19 is pled alternatively to Count 7. Because these counts are based on the alleged misappropriation of property that is alleged to be a trade secret, Counts 18, 19, and 20 are preempted by the GTSA, and are dismissed.

### XV.    Count 21: Equitable Accounting against All Defendants

      Count 21 seeks an equitable accounting because Plaintiff contends "that Defendants Hunger, CAM and BTP have derived a substantial profit or other revenues" based on their alleged use of Sortium's allegedly "confidential and proprietary information." *Pl.'s Sec. Am. Compl.*¶ 254. Because this remedy is based upon the alleged misappropriation of confidential and proprietary information that Sortium claims constitute trade secrets, this remedy may be available to Plaintiff. The Court does not dismiss the equitable accounting claim at this time.

XVI.   Count 22:   Civil Conspiracy against All Defendants

Plaintiff alleges that Hunger, in combination with CAM and Big Time, entered into a conspiracy to commit intentional torts.   The essential element of an alleged conspiracy is proof of a common design establishing "that two or more persons in any manner, either positively or tacitly, arrive[d] at a mutual understanding as to how they will accomplish an unlawful design."   *McIntee v. Deramus*, 313 Ga. App. 653, 656 (2012).   "Absent the underlying tort, there can be no liability for civil conspiracy."   *Jenkins v. Wachovia Bank, Nat. Ass'n*, 309 Ga. App. 562, 567, 711 S.E.2d 80, 85 (2011).   Because Plaintiff has pled at least one viable tort claim against Defendants Hunger and CAM, Plaintiff's conspiracy claim against all Defendants remains intact.   The Court does not dismiss Count 22.

XVII.   Count 23:   Direct and Contributory Copyright Infringement against All Defendants

In its Complaint, Plaintiff alleges that the pitched roof on top of the glove display is entitled to copyright protection.[6]   To establish copyright infringement, a plaintiff must show: 1) ownership of a valid copyright; and 2) copying of original elements of work.   *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 344, 111 (1991)).   "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, which include pictorial, graphic, and sculptural works."   17 U.S.C. § 102(a).   Architectural structures and plans are subject to copyright protection under 17 U.S.C. § 102(a)(5) and (8) where the author has independently created the works and the works reflect creativity, regardless of how simple the design.   *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228, 1231–32 (D. N.J. 1992) (citing *Feist*, 499 U.S. at 344).   "Copyright protection does not extend to 'useful articles,' but individual design elements that comprise a portion of a utilitarian article may be eligible for

---

6  As to ownership of a valid trademark, Plaintiff filed a copyright registration application in the United States Copyright Office on April 30, 2012, just four days before filing its Second Amended Complaint.   According to 17 U.S.C. § 411, an action can be brought for copyright infringement if pre-registration occurs.

copyright protection if the design element is either physically or conceptually separable from the article's functional elements." *Heptagon Creations, Ltd. v. Core Group Mktg. LLC*, No. 12-317-CV, 2013 WL 135409 (2d Cir. Jan. 11, 2013) (citing *Chosun Int'l., Inc. v. Chrisa Creations, Ltd.,* 413 F.3d 324, 328 (2d Cir.2005)).

The level of originality required for copyright protection is not high.   *Feist*, 499 U.S. at 344, 111 S.Ct. at 1287; *see also Eales v. Environmental Lifestyles, Inc.,* 958 F.2d 876, 880 (9th Cir. 1992).   Rather, a work need only exhibit a "minimal degree of creativity." *Feist*, 499 U.S. at 345. "'[A]ll that is needed to satisfy [the originality requirement under] both the Constitution and the statute is that the author contributed something more than a merely trivial variation, something recognizably his own.   Originality in this context means little more than a prohibition of actual copying.'" *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 438 (4th Cir. 1986).

In its Complaint, Plaintiff makes the following statements regarding the roof's original and creative structure: "a pitched roof atop a box-shaped cabinet, giving the visual impression of a shack or a shed . . . with the pitched roof including a pair of triangular gables and a pair of rectangular transparent roof panels that add a greenhouse effect to the structure.   The pitched transparent roof panels and gables are oriented so that the gables are in fore and aft positions respectively, giving the most clear impression of a pitched roof from the front of the Sortium Glove Display."   *Pl.'s Sec. Am. Compl*.¶¶266–277.   Plaintiff claims that these features were the independent and original creation of employees at Sortium.   Defendants argue that the pitched roof is not entitled to copyright protection because: (1) it lacks originality; and (2) the supposed artistry of the pitched roof is conceptually or physically inseparable from the display.

In light of the fact that the roof is transparent, composed of transparent glass material, and is pitched to resemble a hut, it could conceivably be considered "original" and it is possible it is physically or conceptually separable from the overall glove display. *See Feist Publ'ns, Inc. v.*

*Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991); *Vargas v. Pfizer, Inc.,* 418 F.Supp.2d 369, 372 (S.D.N.Y. 2005) ("It is well established that the originality requirement for obtaining a copyright is an extremely low threshold, unlike the novelty requirement for securing a patent. Sufficient originality for copyright purposes amounts to little more than a prohibition of actual copying.") (internal quotations omitted).   This determination of whether Plaintiff's pitched roof is sufficiently original or separable to be copyrighted is a factual issue that is inappropriate for determination on a motion to dismiss given the allegations in this case.   *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 679 F. Supp. 2d 312, 320 (E.D.N.Y. 2010) (finding that when the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve). "Although courts may resolve this issue as a matter of law in certain circumstances, that determination is generally made on a motion for summary judgment, after the parties have conducted discovery and had the opportunity to submit evidence on the issue." *Id.*

Although a close question, this Court at this juncture will not dismiss Plaintiff's copyright infringement claim. Plaintiff has stated a facially plausible copyright infringement claim. Although the Court has doubts as to whether Plaintiff's "pitched roof" design is copyrightable, the Court cannot resolve this issue on the bare record before it.   This issue is more properly determined on summary judgment or at trial.   Plaintiff shall amend its Complaint to state the status of its copyright application.

## CONCLUSION

For the reasons stated above, the Motions are **GRANTED in part** and **DENIED in part**. The Motions to Dismiss counts 1, 2, and 3 are granted in part and denied in part.   Plaintiff's claim against Hunger for breach of the nondisclosure requirements as they relate to customer list remains, because the customer list is alleged to be Plaintiff's trade secret.   Count 2 against Hunger of breach of fiduciary duty in interfering with Sortium's relationship with Big Time

survives.   Count 3 remains to the extent Plaintiff alleges that CAM is responsible for the alleged misappropriation of a trade secret (customer list) that occurred while Hunger was working for CAM.

Counts 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 are dismissed with prejudice in their entirety.   Counts 8, 9, 21, 22, and 23 remain as pleaded.   Plaintiff shall file a clean and red-lined Third Amended Complaint, stating the status of its copyright application and pleading only claims the Court has permitted to proceed within fourteen days of the date of this Order. Because the Court has decided Georgia law applies to Plaintiff's claims, Plaintiff is granted leave to plead violations of the Georgia Trade Secrets Act.   Except as stated herein, Plaintiff may not otherwise amend.   No further motions to dismiss will be permitted except for non-compliance with this Order.

**SO ORDERED.**

Date: March 31, 2013.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS